[Civ. No. 2266. Third Appellate District.—April 22, 1921.]

## F. A. CHADBOURNE, Jr., et al., Copartners, etc., Appellants, v. J. M. WHITE, Respondent.

[1] SALES—WARRANTIES—AGENCY BY RATIFICATION—INSUFFICIENCY OF EVIDENCE.—In this action to recover on a promissory note given in part payment of a tractor, there is no warrant in the evidence to support the theory of the defendant that the tractor was bought on warranties and that the person making them became plaintiff's agent by ratification.

[2] PRINCIPAL AND AGENT—WARRANTIES OF AGENT—RATIFICATION—KNOWLEDGE.—A principal must have knowledge of an agent's warranties in order that he may be charged with their ratification.

APPEAL from a judgment of the Superior Court of Butte County. H. D. Gregory, Judge. Reversed.

The facts are stated in the opinion of the court.

Harry Davids for Appellants.

Bond & Deirup for Respondent.

HART, J.—This action is by the plaintiffs as copartners against the defendant upon a promissory note for the sum of $1,000, dated April 3, 1914, and due and payable on September 1, 1914. The complaint is in the usual form of such an action. In due time the defendant filed an answer, admitting the execution of the note by him and that it was given as in part payment of a certain tractor, but defending himself against the validity of the note on the ground that the tractor failed to measure up to an alleged express warranty made by the seller as to the capacity of the machine to perform the work for which it was designed. The answer alleges that, immediately upon discovering that the tractor was not as warranted, the defendant rescinded the contract for its purchase and offered to restore the tractor to the plaintiffs, at the same time demanding the return to him of the note in suit; that plaintiffs refused, and ever since have refused, to accept the return of said tractor and to deliver to defendant the said note. In the same answer the defendant set up a second defense based upon false and fraudulent representations by the plaintiffs relative to the tractor and its capacity or power for doing the work it was intended for. That cause of action also contained, in the same language as it appeared in the first cause of action, the allegation that, in the month of July, 1914, the defendant first discovered the worthlessness of the tractor and then offered to return the same to plaintiffs and to place the latter in the same position as they were before the defendant entered into the contract for the purchase of the engine, and demanded of plaintiffs the return of the note upon which the complaint declares, and that plaintiffs have at all times since said offer refused to accept the same and to redeliver said note to defendant. The answer prayed for the cancellation of the note and for the sum of $3,000 for loss of

crop by reason of the failure of the tractor to perform the work essential to the growing and the harvesting of the crop for the year 1914.

The special defense or the counterclaim was answered by the plaintiffs, and on the day the cause came on for trial (December 4, 1918) the defendant made an application for leave to amend his answer, and the same was allowed. The effect of the said amendment was to exclude from the answer all the allegations as to false and fraudulent representations and consequently to leave in the case as the sole ground for the rescission of the contract of purchase and thereupon the cancellation of the note in suit the fact, as alleged, that the tractor was not as warranted by the plaintiffs, alleging also that immediately upon discovery of that fact defendant offered to return the tractor, etc.

Upon the issues thus framed, the case was tried and on the sixteenth day of December, 1918, the case was taken under advisement.

On March 11, 1919, no decision then having been arrived at or declared, the defendant moved for leave to file another amended answer and counterclaim so that the same would "conform to the pleadings and the proof taken at the trial." The amended answer changed the allegation with regard to offering to return the tractor, etc., "immediately upon discovering that said tractor was worthless," by stating in lieu thereof that from the time of the delivery of the tractor to the defendant the same "proved unworkable," but that defendant believed and had faith that by making proper repairs on the same that said tractor could be put in condition to perform the labor which the plaintiffs and their agent "warranted and represented that it would perform as aforesaid." The allegation goes on with the statement that defendant continued to have faith, etc., until the date he rescinded the contract of purchase, that the tractor could be put in workable condition, and that he employed many expert tractor engineers on such faith, at great expense, to work on and operate and repair the machine, to no purpose, however, since the parts of the tractor continued to get out of order or be broken; that thus the defendant tested and experimented with the tractor upon the belief that its defects could be so corrected as to render it capable of performing its work properly until the month of

August, 1914, when he discovered that said tractor was inherently defective in its construction and not capable of being repaired so as to make it work as warranted, etc. The relief asked for by this amended answer, in addition to rescission and cancellation, was for damages, not for the crop, as was the prayer in the original pleading of defendant, but for money alleged to have been expended by defendant in repairing and attempting to operate the tractor.

The plaintiffs moved to strike out the second amended answer and also filed a demurrer thereto, but the motion was denied and the demurrer overruled. These orders were made on the eighth day of September, 1919. Plaintiff thereupon filed an answer to the answer and counterclaim of defendant. On the fifteenth day of September, 1919, the court filed a written decision against the plaintiffs, and on the twenty-third day of September, 1919, counsel for plaintiffs moved to reopen the cause before judgment. The principal ground upon which said motion was founded and pressed was that the second amended answer, filed, as seen, after the trial of the case—that is, after the proofs had been received and the case submitted for decision—contained "new and other matter than that contained in the amended answer and cross-complaint upon which said defendant relied when the said cause was tried and heard, and when the said cause was submitted to the above entitled court for decision." This motion was denied.

Findings were made and judgment rendered and entered, rescinding the contract of sale of the tractor and ordering the note in suit to be delivered to defendant for cancellation. The defendant was not awarded damages.

This appeal is by the plaintiff from the judgment so entered, and is supported by a transcript of the proceedings had at the trial, as prescribed by section 953a of the Code of Civil Procedure.

The assignment of error first discussed in the briefs involves the action of the court in allowing the defendant to file the amended answer after trial had been completed and in denying the motion of the plaintiff for a reopening of the case after the filing of said amended pleading, but we may waive consideration of this point, since we have concluded that the judgment must for other reasons be reversed.

In taking up the merits of the controversy it is deemed the more orderly first to state the facts of the transaction upon which this action is founded. One Joseph Peltier was, in the year 1913, and down to the date of the sale thereof by him, the owner of a ranch not far from Suisun City, in Solano County, consisting principally, if not altogether, of tule lands. Either in the month of November or December, 1913, he purchased at Los Angeles two Buffalo-Pitts gas tractors, paying therefor the sum of $1,500 each, the price of said tractors later and at the time of the trial of this action having advanced to the sum of $3,000 each. Before completing the contract for the purchase of said tractors, Peltier had the machines examined by an expert "gas-engine man" employed by him for that purpose. Peltier worked the tractors on his ranch satisfactorily from the time that they were delivered to him (either in the month of November or the month of December, 1913) for very close to two months and until the winter rains set in, causing the ground to become so soft that the engines could no longer be used for plowing purposes. When, for the reason just stated, the working of the tractors ceased, Peltier caused the magneto and electric parts of the machine in question here to be removed and the tractor to be covered at the place on the ranch where the work of operating it had ceased and there allowed it to remain until it was sold and delivered to the defendant in the month of April, 1914, as will be later more fully explained.

Within four months, approximately, after the operation of the tractor had been stopped, as above explained, Peltier sold his ranch and all its equipments, including the tractors referred to, to Chadbourne Bros., the plaintiffs herein. The ranch and all the machinery—the agricultural implements, including, as stated, the tractors mentioned—on said ranch were sold by Peltier for a lump sum.

After Peltier had made arrangements to sell his ranch to the Chadbournes (this statement is based on the testimony of Peltier testifying as a witness for the defendant and is not contradicted), a man named Cline, residing in San Francisco, called on him (Peltier) and said to Peltier that he (Cline) had a client for one of those engines, and asked Peltier if he desired "to sell them." Peltier replied that the tractors were not then his property, and

referred Cline to the plaintiffs. Peltier, at the time of that conversation with Cline, had never met or seen White, the defendant. Peltier never at any time resided on the ranch, his residence being in the city of San Francisco. His son, however, had lived on the ranch, having been in charge of the reclamation work thereon while his father was the owner of the ranch.

Fred A. Chadbourne, one of the plaintiffs, called as a witness by the defendant, testified that he had never met the defendant, White, prior to the transaction eventuating in the sale of the tractor to the latter; that shortly after they (the Chadbournes) had bought the Peltier ranch, he was told by Peltier that he had a prospect for a buyer of one of the tractors, and Chadbourne was referred by Peltier to Cline, who, Peltier told Chadbourne, would give him "the details of what could be done with it"; that he (witness) thereafter called on Cline in San Francisco, and that the latter explained the proposition for the purchase of the tractor, the terms of payment and where and how the same was to be shipped to the defendant, the proposed purchaser; that the proposition made to him by Cline was satisfactory to him and he agreed to pay Cline for his services in effecting the sale of the tractor for the sum of $1,500 twenty per cent of the sale or purchase price.

The defendant White was, at the time of the transactions involved herein, engaged in the business of farming in Butte County, then having under lease 2,000 acres of what was then known as the "Phelan ranch," in said county, and farming the same on shares. About a year prior to the time of the transactions involved herein the said Cline called on White at his ranch and undertook to sell to him (White) a Hart-Parr engine, but failed in the undertaking. Subsequently White received a letter from Cline in which the latter stated that "he had found an engine that would do my work, and all the trouble was that it was too heavy for the ground that it was in." Cline in said letter asked White to "come down and look it over." White shortly thereafter went to San Francisco, and on the day following that of his arrival in that city he, accompanied by Cline and a man named Spears, a friend of the defendant, and who, although a carpenter by trade, had had considerable experience in handling gas engines, went to the Chadbourne

ranch and there inspected the tractor. This was in the month of February, 1914. White, when testifying, stated, in reply to a question by his attorney as to whether "there were any representations" made with regard to the tractor, that there were and that such representations were made "by Mr. Cline and by Mr. Peltier's son." Asked what those representations were, White answered: "Mr. Cline told me the machine was in perfect condition and had never been run only to demonstrate it, and that the only objection to it was that it was too heavy, and that it would do my work here; that he knew that it would do my work on the Phelan ranch, and I asked him how it compared with the Rumley, and he said that it was three times as good an engine as the Rumley. And that is the kind that I hired to help me with the crop. And that is all I remember."

The witness Spears, who, as seen, went to the Chadbourne ranch with defendant to inspect the engine, testified as to the representations or warranty of the tractor made by Cline on that occasion as follows: "After we went up to the engine he [Cline] explained to us what the machine was supposed to do, and what it would do. He represented that the engine was in first-class shape and that it would develop seventy-five horse-power on good ground such as we had up through our valley here, especially in Chico, and so forth, and he said the engine was new and in first-class shape, and up to the representations."

It appears that before F. A. Chadbourne had seen Cline after having been told by Peltier that the former had a prospect for the sale of the tractor, Cline had arranged to get the tractor for White on the following terms: One hundred dollars cash down; $400 to be paid plaintiffs upon the delivery of the tractor to White at his ranch, and a promissory note to be executed and delivered by White to the Chadbournes for the balance, $1,000, said note to become due and payable on the first day of September, 1914. As seen, this arrangement was explained by Cline to F. A. Chadbourne, who accepted it. It further appears that White, before said Chadbourne had seen Cline, had paid Cline the cash payment of $100. This sum Chadbourne permitted Cline to retain as a part of his commission.

The tractor was shipped to and received by White some time in the month of April, 1914. From the time that the machine reached the ranch of White until the date on which the latter received a notice from a local bank that his note in favor of the Chadbournes for $1,000 was due and payable and at said bank for collection, the defendant, according to his testimony, as well as that of a number of other witnesses testifying for him (some of the witnesses were experienced in handling gas engines), experienced much difficulty in making the tractor work. Parts would break on every occasion on which he attempted to use it, and the breaks would, of course, have to be repaired and new parts installed in the machine, and all this at great expense and also resulting in delay in the preparation of his crop for that year. The defendant testified that the engine failed to develop the power which Cline represented that it was capable of developing; that, although it ought to have pulled at least twelve plows, it could not at any time pull a greater number than four or five; that he did succeed in plowing 160 acres of land with it, but this was accomplished with great difficulty, expense, and delay. A number of persons of more or less experience in operating and repairing gas engines, having been called by White to his assistance in efforts to make the engine work satisfactorily, corroborated White's testimony that the tractor would not do the work required of it on his ranch.

Some ten days or two weeks after the tractor had been delivered to White, F. A. Chadbourne went to the White ranch. This was the first time that said Chadbourne had ever met White. Chadbourne testified that White had either telegraphed or written to him, stating that he (White) was having trouble with the machine—that the ignition would not work. The witness said that he had no trouble in starting and operating the tractor. Chadbourne found that certain parts originally of the tractor had been removed and other parts substituted. On the occasion we are now referring to, White did not say to Chadbourne that he desired to return the machine or rescind the contract of purchase, although he testified that the tractor did not work satisfactorily on that occasion.

As before suggested, the note from White to plaintiffs as in part payment for the tractor (dated April 3, 1914)

was due and payable on September 1, 1914. A few days prior to the last-named date the plaintiffs placed the note in the hands of a bank for collection. The bank notified defendant that it had the note and requested him to call and take it up. The defendant called at the bank and declared to a proper officer thereof that he would not pay the note; that the tractor was a mechanical failure and wholly worthless. On the 29th of August, 1914, a few days prior to the maturity of the note, and after defendant had been notified that the note was in the hands of the bank for collection, the defendant addressed the following letter to plaintiffs: "I notified Mr. Cline 2 months ago I couldn't do anything with the engine and I intended to give it up. It has been a bill of expense to me and I could accomplish nothing. I have fooled with the damned thing until it has practically broke me up. It broke down at the beginning of harvest and I had to hire an oil-pull to pull my machine, and by the time I got the extras from Buffalo, New York, I was through harvesting. I paid seven hundred dollars for the use of the engine 21 days, and getting extras and fixing the Buffalo tractor cost two hundred and fifty dollars to fix it up and it hasn't done anything since. I found it is first one thing breaks and then another. Now I don't intend to pay any more on the engine. The engine is here. If you want it—alright."

To the above statement is to be added the testimony of defendant to the effect that when he inspected the tractor on the Chadbourne ranch, prior to entering into the contract for its purchase, he came to the conclusion that the engine was worth the price he asked for it. It should also be stated, as the court in effect found, that the defendant, when testifying, offered as excuse for delay in rescinding the contract the statement that, notwithstanding the repeated "breakdowns" of the engine, he still had faith that it could finally be made to operate satisfactorily and that he was encouraged to cherish such faith and belief until the month of August, 1914, when he discovered that the failure of the machine to operate properly was due entirely to its inherent defects, or defects which could not be remedied.

The foregoing statement, which embraces the salient facts of the transaction from the time of the purchase of the tractor by defendant to the time of his alleged rescission

of the contract of purchase, is based entirely upon the testimony of witnesses called by and in behalf of the defendant. It should also be stated that neither Cline nor the younger Peltier testified in the case.

As the attorney for appellant correctly declares in his brief, to uphold his special plea in bar or defense, it was incumbent upon the defendant to prove these facts: 1. That Cline was the agent of the plaintiffs, with authority to sell the tractor; 2. That Cline, as such agent, warranted the tractor to be capable of performing satisfactorily the work for which such a machine is intended; 3. That the tractor failed to measure up to the warranty; and, 4. That there was prompt rescission of the contract of purchase upon discovery of the alleged defects of the tractor rendering it incapable of doing the work as warranted. The plaintiffs contend that none of these essential elements to warrant a recovery by defendant was shown by the evidence to exist.

The theory upon which the defendant tried his case in the court below was that the alleged warranty or representations were made by Cline when he was prosecuting the alleged negotiations with Peltier for the tractor, and that the plaintiffs having concluded the transaction already started by Peltier and Cline when the former was still the owner of the engine, and accepted the benefits thereof, must be held to have ratified the transaction as so begun, including whatever representations or warranty that might have been made by Cline to defendant as to the quality, condition, and horse-power of the tractor. The case is presented by respondent upon this appeal upon the same theory and the proposition is thus stated in his brief: ''Respondent's theory is that Cline became Chadbourne's agent by ratification; that the tractor was bought on warranties, and that there was a sufficient and proper rescission.''

[1] There is, as we read the record before us, absolutely no warrant in the evidence for the position of defendant upon the question of the alleged ratification of the transaction so far as Peltier had anything to do with it, if, as a matter of fact, he may be said to have been a party to it at all. As seen, the testimony of Peltier is that, when Cline approached him with the proposition to buy or sell the tractor, he (Peltier) had sold the tractor with his ranch to plaintiffs, and that he referred Cline

to the plaintiffs to make with them as owners of the machine such arrangements about selling or purchasing it as he might be able to negotiate. Peltier's testimony was not contradicted. It is true that defendant testified that Cline told him, when the latter first brought to his (defendant's) attention the tractor in question, that Peltier was then the owner of the engine, but that testimony was purely hearsay or, at any rate, is valueless in the face of the positive testimony of Peltier himself that he had sold the machine to the Chadbournes prior to the time at which Cline first spoke to him about selling it. Furthermore, if it be assumed that Peltier did own the machine at the time Cline first approached him with a proposition to purchase or sell the same, then there is no evidence of any kind or character showing, or even tending to show, that the plaintiffs, when accepting Cline's proposition for the sale of the tractor to defendant, had any knowledge of the facts characterizing the transaction between Cline and defendant, or, in other words, had any knowledge that the inducing cause of the sale of the tractor to defendant was the warranty made by Cline as to the character and capacity of the engine while he was negotiating with Peltier. [2] "Ratification necessarily presupposes a knowledge of the thing ratified." (*Huffman* v. *Knapp,* 30 Cal. App. 759, 761, [159 Pac. 456].)

The above considerations are, upon the theory upon which it was tried and is presented by the defendant, decisive of the case against the legal validity of the judgment appealed from. We may, however, with no impropriety, notice some other features of the case as it is presented here.

It is only a rational interpretation of the evidence to hold that Cline's position in the transaction was merely that of a broker. The defendant testified, as seen, that about a year prior to the date of the receipt by him of a letter from Cline that he (Cline) had found a tractor that would be suitable for his (defendant's) purposes, Cline made a futile attempt to sell him a Hart-Parr tractor; that subsequently the letter referred to was addressed to defendant by Cline. From this testimony the inference is reasonable and, indeed, natural, that Cline had been looking about for a tractor for the defendant—that is, looking for an engine that he could sell to the defendant. F. A. Chadbourne tes-

tified as a witness for defendant (and there is no contradiction to this testimony) that when he called on Cline in San Francisco for the first time after having been told by Peltier that the former had a proposition to make with respect to the sale of the engine, Cline said to Chadbourne that defendant would buy the tractor for $1,500; that he had already paid him (Cline) $100 down on the proposition; that he would make a further payment of $400 on the delivery of the engine to him (defendant) and give to Chadbourne his promissory note for the balance—$1,000—payable September 1, 1914. Chadbourne then agreed to pay Cline twenty per cent of the purchase price as his compensation for negotiating the sale of the tractor, and also told Cline that he could retain the $100 cash payment as part of his commission. Thus it is clear that Cline had already arranged for the sale of the tractor before he had ever seen or communicated in any manner with Chadbourne about the proposed sale, and it would seem to be equally clear from this testimony that Cline was acting no less for the defendant than he was for the plaintiffs. In other words, the testimony just adverted to well affords the inference that Cline was a mere broker in the transaction, acting for himself and upon his own initiative. An agent of the Chadbournes he became, it is true, but only when, after laying the proposition of the defendant before them for the sale of the tractor, they accepted the proposition made by Cline for defendant, and he was then still no less the agent of the defendant than that of the plaintiffs. But he then became their agent only to the extent of being authorized to execute the terms upon which the sale was to be made. The proposition for the purchase of the tractor and the terms thereof having first come from defendant to the Chadbournes through Cline, and whatever representations Cline made to defendant as to the character of the tractor having been so made before Cline became the agent of the plaintiffs, it is manifest that the latter cannot be bound by the representations or warranty so made. However, we think the judgment should be reversed for the reasons first hereinabove given, and it is so ordered.

Burnett, J., and Prewett, P. J., *pro tem.*, concurred.